**LTL ATTORNEYS LLP**
Caleb H. Liang (Bar No. 261920)
  caleb.liang@ltlattorneys.com
Prashanth Chennakesavan (Bar No. 284022)
  prashanth.chennakesavan@ltlattorneys.com
Michael A. Pearlson (Bar No. 329757)
  michael.pearlson@ltlattorneys.com
300 S. Grand Ave., 14th Floor
Los Angeles, CA 90071
Phone: (213) 612-8900 / Fax: (213) 612-3773

Attorneys for Plaintiff
Anton Toutov

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTON TOUTOV, an individual,<br><br>              Plaintiff,<br><br>       v.<br><br>CURATIVE LABS INC., a California corporation; CURATIVE INC., a Delaware corporation; JONATHAN MARTIN, an individual; PAUL SCOTT, an individual; KORVA HOLDINGS LLC, a California limited liability company; and KORVA SCIENTIFIC, INC. a California corporation,<br><br>              Defendants. | Case No. 2:20-cv-11284<br><br>**COMPLAINT FOR**<br>**(1) VIOLATION OF CAL. CORP. CODE § 1600,** *et seq.*<br>**(2) BREACH OF FIDUCIARY DUTY**<br>**(3) ACCOUNTING**<br>**(4) BREACH OF CONTRACT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Anton Toutov ("Dr. Toutov") brings this Complaint against Defendants Curative Labs Inc. ("CLI") (f/k/a KorvaLabs, Inc. and SA Laboratories Inc.); Curative Inc. ("Curative"), Korva Holdings LLC ("Korva Holdings"), Korva Scientific, Inc. ("Korva Scientific") (CLI, Curative, Korva Holdings LLC, and Korva Scientific, Inc. and referred to herein collectively as "Curative-Korva"), Jonathan Martin ("Martin"), Paul Scott ("Scott"), and alleges as follows:

## INTRODUCTION

1.     Anton Toutov is an award-winning[1] researcher, entrepreneur, and chemist. Dr. Toutov holds a Ph.D. from the California Institute of Technology ("Caltech") in Organic Chemistry and has co-authored 10 scholarly, peer-reviewed publications, and is an inventor on more than 60 granted patents and patent applications in the US and internationally, in a variety of areas including diagnostics, therapeutics, and clean energy. His research has been featured by NASA, Scientific American, The Royal Society of Chemistry (UK), NSERC (Canada) and the National Science Foundation (USA). In addition to being an entrepreneur, Dr. Toutov is currently an Assistant Professor (by courtesy) in the College of Engineering at Virginia Commonwealth University and a senior technical adviser to the Gates Foundation-funded Medicines for All Institute (M4All), in addition to holding other positions.

2.     In early 2015, Dr. Toutov was recruited to join CLI (then incorporated as SA Laboratories Inc., which was itself only founded in late 2014) as one of the company's three founders. At the time, CLI had no meaningful business operations and had neither the infrastructure nor necessary certifications to conduct any significant scientific testing—CLI was a company in its infancy.

3.     Dr. Toutov immediately started working with CLI, Scott (the CEO), and

---

[1] Among many others, Dr. Toutov's awards include the Demetriades–Tsafka–Kokkalis Prize in Entrepreneurship, 2016; Bristol–Myers Squibb (BMS) Fellowship in Synthetic Organic Chemistry; and Milliken & Co. Research and Development "Deep Science" Award.

COMPLAINT

Martin (the COO) to build every aspect of the company's business. Over the next four years, Dr. Toutov was critical to the company's growth and success, contributing to everything from securing, building, and designing laboratory and office space to obtaining necessary government certificates, hiring employees, helping manage the company's purchasing and operational needs, and meeting with governmental agencies and potential partners, advisers, and investors.

4.     Dr. Toutov was initially the Chief Science Advisor, and later the Chief Science Officer and Science Director of CLI. In that role, he provided a strong scientific reputation, scientific input, and made contributions to virtually all aspects of the company. He was the company's only founder having an advanced degree in the chemical or biological sciences.

5.     Dr. Toutov was not paid any salary for his contributions to CLI. Instead, CLI offered Dr. Toutov a 20% ownership interest in the company (which was documented in a stock certificate awarded in 2016) and promised to provide Dr. Toutov cash compensation once the company started earning more revenues. Between 2015 and 2019, Martin and Scott claimed they were not taking a salary from the company. Dr. Toutov never received a salary or reimbursements for out-of-pocket expenses from CLI.

6.     Although Martin, Scott, and Dr. Toutov ran the company jointly, collaborating on all important decisions, as majority shareholders, Martin and Scott controlled the company and the board of directors. Although Dr. Toutov was added to the board on or around September 2017, as reflected in CLI's filing with the Secretary of State, the startup did not observe strict corporate formalities or hold board meetings. Instead, Martin, Scott, and Dr. Toutov jointly made decisions regarding the company's operations in meetings and telephone calls. Martin, and to a lesser extent Scott, had primary responsibility for overseeing the company's finances day-to-day; Dr. Toutov focused on the operational and growth aspects of the company.

7.     During 2016 and 2017, CLI focused on anti-doping testing, and the testing

and certification of vitamins and food supplements for various companies. The company earned revenues in the low-mid six-figure range, all of which was used to fund the company's operating costs and manage its growth.

8.   In 2018, CLI obtained a Clinical Laboratory Improvement Amendments ("CLIA") Certificate, without which CLI could not expand to offering certain clinical diagnostic testing or test certain human biological samples. Of the three co-founders, only Dr. Toutov had an advanced degree in chemistry; he was instrumental to the application.

9.   The expanded testing capabilities made it possible for CLI to greatly expand its business and testing offerings. Its revenues grew and the company was able to cover increasing operating expenses, but not salaries for the three co-founders. Nevertheless, Dr. Toutov continued in his efforts to help grow the business.

10.   In late 2019, after Dr. Toutov had worked for over four years without any pay to develop and grow the company, Martin and Scott demanded that Dr. Toutov voluntarily relinquish his 20% equity. Dr. Toutov refused, and insisted on greater transparency, including full access to company books and records (which were managed by Scott and Martin). Instead of being provided the information, Dr. Toutov was ousted. Dr. Toutov's email and file access accounts were turned off and he was precluded from taking part in—and not informed of—corporate decisions.

11.   On information and belief, Martin and Scott subsequently entered into a number of corporate transactions. First, they entered into a corporate transaction merging KorvaLabs, Inc. and a newly formed entity called Curative Inc. Then, they changed the name of KorvaLabs, Inc. to Curative Labs Inc. In mid-2020, they registered new entities Korva Holdings, LLC and Korva Scientific, Inc. On information and belief, Curative Labs Inc., Curative Inc., Korva Holdings, LLC and Korva Scientific, Inc. are alter egos and refer to the same entity.

12.   Dr. Toutov was not provided any notice of corporate transactions. Nor was there any vote of shareholders in which Dr. Toutov participated.

13.     Curative-Korva has gone on to become a leader in COVID-19 testing using the very same business Dr. Toutov helped build. The company even uses the same physical lab space in San Dimas that Dr. Toutov secured and helped design, maintain, and build out.

14.     Defendants have refused to provide corporate and financial information to Dr. Toutov; engaged in corporate transactions without appropriate votes of shareholders; refused to acknowledge Dr. Toutov's equity interest in the relevant corporate entities; and refused to pay Dr. Toutov his share of profits and financial interests.

# PARTIES

15.     Until March 2020, Dr. Toutov was an individual residing in Pasadena, California.  He is now a resident of Houston, Texas.

16.     On information and belief, Defendant Curative was at all relevant times, and is, a Delaware corporation with its principal place of business in Menlo Park, California. On information and believe, Curative also does business in California as Curative Bio Inc.

17.     On information and belief, Defendant Korva Holdings was at all relevant times, and is, a California limited liability company with its principal place of business in Azusa, California.

18.     On information and belief, Defendant Korva Scientific was at all relevant times, and is, a California corporation with its principal place of business in Azusa, California.

19.     On information and belief, Defendant Martin was at all relevant times an individual residing in Monrovia, California. He is now a resident of Azusa, California.

20.     On information and belief, Defendant Scott was at all relevant times, and is, an individual residing in South Pasadena, California.

21.     On information and belief, Defendant CLI first organized as a California corporation under the name SA Laboratories Inc. with its principal place of business in

the County of Los Angeles, California on November 24, 2014. CLI subsequently amended its Articles of Incorporation on December 12, 2018 to change the name of the corporation to KorvaLabs, Inc. CLI subsequently amended its Articles of Incorporation on May 27, 2020 to change the name of the corporation to Curative Labs Inc. CLI maintains its principal place of business in San Dimas, California.

22.    On information and belief, in performing the acts and omissions alleged herein, each of the Defendants named herein was the agent and employee of each of the other Defendants and was acting within the course and scope of such agency and employment and with the knowledge and approval of each of the other Defendants.

23.    On information and belief, Curative, CLI, Korva Holdings, and Korva Scientific, while separate business entities, have merely been used by Defendants at various points in time to conduct identical business operations. On further information and belief and at all times relevant herein, there existed a unity of interest and ownership between Curative, CLI, Korva Holdings, and Korva Scientific such that any individuality and separateness between them never existed or has ceased to exist, and that said Defendants are the alter egos of each other. On further information and belief, at all relevant times these Defendants conceived, intended, and used each other as a device for purposes of substituting financially for the other. On further information and belief and at all times relevant, said Defendants held themselves out to others as separately liable for debts of each of the other, used assets of each of the other Defendants for their own purposes as though it were their own, and/or caused assets to be transferred between them or to entities they controlled. On further information and belief, adherence to the fiction of the separate existence of said Defendants, and each of them, as an entity distinct from the other would permit an abuse of the corporate privilege, would sanction fraudulent and misleading practices, and promote injustice.

**JURISDICTION AND VENUE**

24.    This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332. The matter in controversy exceeds the sum or value of seventy-five thousand U.S. Dollars

($75,000), exclusive of interest and costs. Defendants are: a corporation incorporated under the laws of the State of Delaware with its principal place of business in the State of California; two corporations incorporated under the laws of the State of California with their principal places of business in the State of California; a limited liability company formed under the laws of the State of California with its principal place of business in the State of California; and two individuals who are citizens of the State of California. Plaintiff is a citizen of the State of Texas.

25. This Court has personal jurisdiction over the Defendants because Defendants' principal place of business is in the State of California, and/or Defendants are entities having sufficient minimum contacts with the State of California so as to render the exercise of jurisdiction over Defendants consistent with traditional notions of fair play and substantial justice, and/or Defendants reside in the State of California with intent to remain.

26. Venue is proper in this District under 28 U.S.C. § 1391 because Defendants CLI, Martin, Scott, Korva Holdings, and Korva Scientific reside in Los Angeles County, California.

## ADDITIONAL BACKGROUND FACTS

**Dr. Toutov is Invited to Join a Fledgling Company as Its First Chief Scientific Officer**

27. Defendant Scott registered a California corporation called SA Laboratories Inc. on November 24, 2014.

28. On information and belief, SA Laboratories provided consulting services related to anti-doping testing for athletes. At the time, SA Laboratories did not conduct any meaningful testing on its own. Nor did it have significant laboratory space.

29. On information and belief, between 2014 and April 2015, Martin joined SA Laboratories. As of April 2015, Scott and Martin were the sole owners of SA Laboratories. Scott was the Chief Executive Officer and Martin was the Chief Financial Officer and Chief Operating Officer.

30.     In April 2015, Martin approached Dr. Toutov to join SA Laboratories. Although it would not officially change its name until 2018, Martin and Scott referred to the company as KorvaLabs.

31.     Martin and Scott needed Dr. Toutov's assistance on every aspect of the business to help KorvaLabs become a successful testing laboratory. That required, among other things, helping the company to identify laboratory space and equipment, receive and maintain Clinical Laboratory Improvement Amendments ("CLIA") and Drug Enforcement Administration ("DEA") certifications, recruit and hire qualified professionals, investor outreach, and marketing. In other words, CLI needed an individual with a specific expertise, academic credentials, and broad networks within the chemical and biological sciences to help run the laboratory. At the time, KorvaLabs had few of the necessary ingredients to operate a successful testing laboratory.

32.     Because KorvaLabs did not have significant business operations at the time, it was unable to offer Dr. Toutov a salary. Instead, KorvaLabs, Martin, and Scott recruited Dr. Toutov by offering him a 20% equity interest in the company and a promise of financial compensation in the future once the company started earning reasonable revenues.

**Dr. Toutov Immediately Brings Value to CLI After Accepting Martin and Scott's Offer**

33.     Pursuant to the agreement between the parties, Dr. Toutov immediately began spending long hours building KorvaLabs and engaged fellow scientists and colleagues to support the company. Dr. Toutov initially held the title of "Chief Science Advisor" and was a crucial aspect of developing KorvaLabs's testing abilities, and outreach to investors, customers, and the general public.  Dr. Toutov's responsibilities and contributions included (i) helping build the company's testing capabilities; (ii) securing, building, designing, and maintaining office and lab space for the company; (iii) helping obtain and maintain CLIA and DEA certifications; (iv) meeting with potential investors; (v) representing KorvaLabs at conferences and events; (vi) drafting

grant applications and an academic curriculum that the company could use to increase its profile; and (vii) networking with colleagues, peers, and entrepreneurs at other biotech startups, among other efforts.

34.    As just one example, when KorvaLabs was focused on anti-doping testing, in mid-2016, Dr. Toutov delivered research and analysis on a project related to a new halogenated steroid that was ostensibly causing trouble in professional sports. KorvaLabs was attempting to secure a contract for services related to the steroid given that the company specialized in sports testing and anti-doping at that time. To try and pursue that business, Dr. Toutov's work contemplated a highly rigorous and extensive strategy for synthesizing the molecule underlying the steroid. Neither Scott nor Martin had the requisite experience to complete the work.

**Dr. Toutov Helps Build CLI's Laboratory**

35.    One of Dr. Toutov's lasting contributions to CLI's success and progress involved his helping build out lab space and testing capacity that the company needed to get off the ground. That involved negotiating and finalizing a deal for a significant new office and lab space with So Young America, Inc. ("So Young"), helping identify and purchase necessary equipment, designing and maintaining the lab space, and finally helping hire employees.

36.    In November 2015, Dr. Toutov secured a deal in which So Young agreed to allow KorvaLabs (as CLI was known then) to move to So Young's building in San Dimas in exchange for provision of certain laboratory services—an extremely favorable deal that could not have been achieved without Dr. Toutov's leadership. As part of the agreement, KorvaLabs and So Young were to jointly build out the laboratory space to KorvaLabs specifications, with So Young bearing a portion of the responsibility.

37.    On or about April 13, 2016, So Young and KorvaLabs executed a Memorandum of Understanding memorializing the terms of the agreement. The deal was celebrated among Dr. Toutov, Scott, and Martin, the last of whom sent an email

of congratulations to Dr. Toutov. The agreement Dr. Toutov had negotiated was instrumental to the company's continued existence; without optimal laboratory space, CLI could not get off the ground. The laboratory facility remains a cornerstone of Curative-Korva's operations.

38.     On or about September 9, 2016, KorvaLabs moved into the So Young facility located at 430 South Cataract Avenue in San Dimas, California under its agreement with So Young.

39.     KorvaLabs touted its new location in presentations to investors and promotional materials, which stated it "is located in the city of San Dimas, CA and is housed in a 14,000 square foot ISO 9001:2015 clean room accredited building with ample space for expansion and additional infrastructure."

40.     Shortly after moving into their new office and lab space, Martin, Scott, KorvaLabs, and Dr. Toutov formalized the grant of a 20% interest in KorvaLabs to Dr. Toutov. At no time during this period did Martin and Scott question Dr. Toutov's commitment, time contribution, or value to the company.

**Dr. Toutov Becomes an Owner and the Chief Science Officer**

41.     On or about September 30, 2016, pursuant to the parties' agreement, CLI, Martin, and Scott provided a stock certificate to Dr. Toutov reaffirming his promised ownership of 20% of KorvaLabs. The certificate states, "This Certifies that Anton Toutov, PhD is holder of 25 shares of the 125 total shares issued by KorvaLabs, Inc.," and is signed by both Martin and Scott in their capacities as board members. A true and correct copy of the stock certificate is attached hereto as Exhibit A.

42.     The stock grant was unconditional and was not subject to any vesting schedule or any other contingencies.

43.     After formally becoming a partial owner of KorvaLabs, Dr. Toutov maintained and/or increased his substantial contributions to the company. In recognition of his increased role, Dr. Toutov's title was changed to "Chief Science Officer" from "Chief Science Advisor" in part to reflect his ownership interest and

import within the company. Dr. Toutov continued to meet with prospective investors and partners; represent KorvaLabs at conferences and events; help maintain the laboratory and work with KorvaLabs's other scientists and team members; and network with colleagues, peers, and entrepreneurs at other biotech startups, among other efforts.

44.     For the next three years, KorvaLabs leveraged Dr. Toutov's role with the company. That included prominently featuring him (and his impressive background and credentials) on the company's website and promotional materials. Further, Dr. Toutov consistently expanded his role with the company.

45.     For example, in mid-2017, KorvaLabs started the formal process to obtain CLIA certification. The Center for Medicare and Medicaid Services requires any laboratory that performs tests on certain materials derived from the human body for the purpose of providing information for the diagnosis, prevention, or treatment of any disease, to receive CLIA certification. The certification was crucial for KorvaLabs's success.

46.     In August 2017, Martin and Scott proposed that Dr. Toutov take an increasingly key role in overseeing KorvaLabs's lab. Martin and Scott knew that of the three primary owners (i.e, Scott, Martin, and Dr. Toutov), only Dr. Toutov had a doctoral degree, which made him uniquely placed to oversee high complexity testing.

47.     Dr. Toutov guided the certification process, and KorvaLabs ultimately passed its CLIA inspection on or around November 28, 2017, which allowed it to begin testing CLIA-regulated patient samples.

48.     Dr. Toutov also became integral in evaluating prospective employees and making personnel decisions. He also established KorvaLabs's first advisory board by identifying and recruiting an experienced faculty member at a top institution who was a Ph.D., M.D., and FACN to become KorvaLabs's first and only medical advisor. KorvaLabs prominently featured the advisor in its public-facing materials.

49.     Further, on or about February 7, 2018, Dr. Toutov helped draft a grant proposal to the Small Business Innovation Research (SBIR) program, which distributes

federal funds for research and development. The grant itself listed Dr. Toutov as Chief Science Officer.

50.     To help button up the company's inventions, Dr. Toutov reached out to a personal friend, a patent attorney, to secure legal services. The attorney agreed to defer fees for his services.

51.     In addition, Dr. Toutov oversaw the expansion of KorvaLabs's lab space to double its initial size.

52.     Dr. Toutov was critical to every aspect of KorvaLabs's business. Yet, during his tenure, because of the company's modest revenues during the growth phase of the company, Dr. Toutov did not take any salary, reimbursements, or payment whatsoever. To the contrary, he personally paid for expenses he incurred on behalf of the company. Dr. Toutov was willing to work tirelessly towards KorvaLabs's success because of his equity interest in the company, and agreement with Scott and Martin that Dr. Toutov would receive additional cash compensation (along with Scott and Martin) once the company earned reasonable revenues.

**Martin and Scott Refuse to Provide Details About the Company's Finances**

53.     There is no doubt about Dr. Toutov's ownership of CLI. In addition to his share certificate, multiple KorvaLabs filings and submissions confirm Dr. Toutov's equity interest.

54.     As just a few examples:

- On March 29, 2017, Dr. Toutov signed a waiver to be excluded from KorvaLabs's workers' compensation insurance policy as an officer-director of the company. KorvaLabs and Dr. Toutov certified that Dr. Toutov owned "at least 15 percent (15%) of the issued and outstanding stock," as required by California law to obtain the waiver. *See* Exhibit B.

- On September 6, 2017, KorvaLabs (then known as SA Laboratories Inc.) listed Dr. Toutov as the corporate secretary, and a director of the

company. *See* Exhibit C.

- The City of San Dimas issued a business license certificate for the period of October 1, 2017 to September 30, 2018 that lists Dr. Toutov's name along with Martin and Scott. *See* Exhibit D.

- On September 4, 2018, KorvaLabs (then still known as SA Laboratories Inc.) continued listing Dr. Toutov as a director of the company. *See* Exhibit E.

- KorvaLabs's Disclosure of Ownership and Control Statement filed with the California Health and Human Services Agency, which was included as part of the CLIA application package, lists Scott, Martin, and Dr. Toutov as the only individuals with an ownership or controlling interest in CLI as of September 6, 2018. *See* Exhibit F.

55.    On December 12, 2018, SA Laboratories officially changed its name to KorvaLabs, Inc., as reflected in its Certificate of Amendment of Articles of Incorporation. The Certificate states that the change was "duly approved of the board of directors" and is signed by Scott and Martin. However, Dr. Toutov did not participate in any board approval. Nor was he informed of the decision to amend the Articles of Incorporation.

56.    On August 29, 2019, KorvaLabs filed a Statement of Information with the Secretary of State that conspicuously omits Dr. Toutov's name from the list of directors. Dr. Toutov was never informed of the decision.

57.    Although Scott and Martin, and Dr. Toutov had jointly run the company, unbeknownst to Dr. Toutov, starting in 2019, Scott and Martin secretly excluded Dr. Toutov from key decisions and kept him in the dark about the details of the company's finances.

**Martin and Scott Attempt to Divest Dr. Toutov of Ownership**

58.    Despite Dr. Toutov's numerous significant contributions to CLI over four years and indisputable ownership interest, Martin and Scott attempted to divest Dr.

Toutov of his rightful interest in CLI in 2019. In September 2019, the three owners of CLI were scheduled to meet at the company's offices to discuss the company's operations and future plans. Martin and Scott never arrived at the meeting.

59.     Instead, in late 2019, Martin and Scott insisted that Dr. Toutov relinquish his ownership interest. When Dr. Toutov refused, he was ousted from the company. His access to company emails and files was terminated.

60.     On information and belief, Martin and Scott acted upon greed and in an effort to steal Dr. Toutov's equity for themselves once Dr. Toutov became expendable—after Martin and Scott had used Dr. Toutov's time and expertise for four years to build the company and bring it to the verge of success in human clinical diagnostic testing.

61.     On or about January 14 and 16, 2020, after meeting with Scott about his equity interest in CLI, Dr. Toutov sent Martin, Scott, and CLI two separate requests to review CLI's books and records. Despite the fact that Scott had asked Dr. Toutov to send the requests, Dr. Toutov never received a response.

62.     To date, Dr. Toutov has not received the books and records he requested in January 2020.

**CLI Undergoes Corporate Transactions Unbeknownst to Dr. Toutov**

63.     Dr. Toutov has received no information about CLI since he was ousted including, on information and belief, Curative Labs Inc. and Curative Inc.'s merger.

64.     On information and belief, KorvaLabs, Inc. changed its name to Curative Labs Inc. on or about May 2020.

65.     On information and belief, there was a merger between CLI and Curative Inc. on or about May 2020. In stark contrast to CLI, Curative had no meaningful operations before the merger. Curative was not registered with the California Secretary of State until March 2020, just two months before the merger with CLI.

66.     In mid-2020, Scott and Martin registered two more corporate entities that, on information and belief, carry on the same business—Korva Holdings and Korva

Scientific.

67.    On information and belief, Curative-Korva is a successor of CLI. Curative Inc., Curative Labs Inc., Korva Holdings LLC, and Korva Scientific, Inc. now refer to the same corporate entity.

68.    On information and belief, Curative, CLI, Korva Holdings, and Korva Scientific are alter egos of each other.

69.    Paramount to Curative-Korva's success is the infrastructure Dr. Toutov helped create, maintain, and grow, including the physical lab space and certifications that KorvaLabs secured. Curative-Korva to this day continues operating out of the same CLIA-certified lab space Dr. Toutov secured and infrastructure and systems Toutov helped build and establish.

70.    Since early 2020, Curative-Korva has used this infrastructure to pivot into providing COVID-19 testing. When Curative-Korva obtained Emergency Use Authorization (EUA) to conduct COVID-19 testing, that authorization was for testing "limited to the single site of KorvaLabs, Inc. [in] San Dimas CA," the CLIA "certified high-complexity laboratory" that Dr. Toutov helped build. *See* Exhibit G (Curative SARS-Cov-2 Assay Accelerated Emergency Use Authorization (EUA) Summary), *available at* https://www.fda.gov/media/137089/download.

71.    The existing company and infrastructure Dr. Toutov helped build was not only indispensable, but the primary driver of Curative-Korva's operations.

72.    On information and belief, Curative Inc. began as a 2020 start-up (retooled from a 2019 failed start-up called Shield Bio that ran out of funding). Curative and CLI's business is built around the existing operations and infrastructure of KorvaLabs.

73.    Frederick Turner, the current CEO of Curative-Korva, has explained that testing human biological samples for COVID-19 can only take place in a CLIA-certified high complexity laboratory. However, as of early-mid 2020, few laboratories in the country had the necessary space, infrastructure, and certification. The company's San Dimas facility—with its ample 14,000 square-foot lab facility, existing testing

infrastructure, and CLIA certification—did.

74.  Dr. Toutov is unquestionably a 20% owner of CLI, Curative, Korva Holdings, and Korva Scientific. On information and belief, Curative-Korva have realized in excess of ten million in profits during 2020.

75.  Yet, Dr. Toutov has never been provided with books and records of the companies or permitted to vote on any corporate transaction.

76.  Nor has Dr. Toutov been provided his share of corporate profits and distributions.

77.  Dr. Toutov now brings suit to enforce his rights and to be made whole.

## FIRST CAUSE OF ACTION

### Violation of Cal. Corp. Code § 1600, *et seq.*

### (Against CLI)

78.  Plaintiff hereby incorporates the previous paragraphs of this Complaint by reference as though fully set forth herein.

79.  Dr. Toutov requested books and records of CLI on January 16 and 20, 2020.

80.  Dr. Toutov's requests were in writing and a purpose reasonably related to his interests as a shareholder of CLI, and were in fact requested by Scott.

81.  CLI has refused to provide Dr. Toutov with books and records of the company.

82.  CLI's refusal is in violation of Corporations Code section 1600, *et seq.*

83.  Dr. Toutov is entitled to the books and records of CLI & Curative, and an award of reasonable attorneys' fees and costs.

## SECOND CAUSE OF ACTION

### Breach of Fiduciary Duty

### (Against Martin and Scott)

84.  Plaintiff hereby incorporates the previous paragraphs of this Complaint by

1   reference as though fully set forth herein.

2       85.    As alleged above, Dr. Toutov was and is a substantial shareholder of CLI,

3   Curative, Korva Holdings, and Korva Scientific.  As members of the board of directors

4   and officers of the company, Martin and Scott at all times owed Dr. Toutov the

5   fiduciary duties of disclosure, loyalty, and care. Pursuant to such fiduciary duties,

6   Martin and Scott were required to act in the utmost good faith towards Plaintiff, and to

7   avoid acts and omissions adverse to Dr. Toutov. By virtue of this fiduciary relationship,

8   Dr. Toutov reposed trust and confidence in the integrity of Martin and Scott. Dr. Toutov

9   provided no cause for Martin or Scott to act in any manner inconsistent with the

10  fiduciary relationship.

11      86.    Martin and Scott breached their fiduciary duties, including the duties of

12  disclosure, loyalty, and care to Dr. Toutov by engaging in the acts and omissions

13  alleged above.

14      87.    Martin and Scott intended to induce Dr. Toutov to rely on their fiduciary

15  relationship, and in reasonable reliance thereon, Dr. Toutov was induced to and did

16  continue his fidelity.

17      88.    As a direct and foreseeable result of these breaches of fiduciary duty by

18  Martin and Scott, Dr. Toutov has sustained damages in an amount according to proof

19  within the jurisdiction of this Court.

20      89.    The aforementioned conduct was intentional on the party of Martin and

21  Scott, to thereby deprive Dr. Toutov of property and legal rights and otherwise cause

22  injury and was despicable conduct that subjected Dr. Toutov to cruel and unjust

23  hardship and oppression in conscious disregard of his rights, so as to justify an award

24  of exemplary and punitive damages.

25      **THIRD CAUSE OF ACTION**

26      **Accounting**

27      **(Against Defendants)**

28      90.    Plaintiff hereby incorporates the previous paragraphs of this Complaint by

reference as though fully set forth herein.

91.    As alleged above, Defendants are improperly withholding Dr. Toutov's rights and interests in CLI, Curative, Korva Holdings, and Korva Scientific. Because Defendants have improperly withheld Dr. Toutov's rights and interests in CLI, Curative, Korva Holdings, and Korva Scientific, and because they control those entities, the precise value of Dr. Toutov's rights and interests is unknown and cannot be ascertained without a careful accounting and analysis of financial records, agreements, and other documents.

## FOURTH CAUSE OF ACTION

### Breach of Contract

### (Against CLI, Curative, Korva Holdings, and Korva Scientific)

92.    Plaintiff hereby incorporates the previous paragraphs of this Complaint by reference as though fully set forth herein.

93.    Defendants have disavowed both the stock grant agreement to Dr. Toutov and the corporate bylaws and/or shareholder agreements. Dr. Toutov sues to recover his true ownership interest in CLI, Curative, Korva Holdings and Korva Scientific.

94.    All conditions required by the relevant agreements have occurred.

95.    CLI, Curative, Korva Holdings, and Korva Scientific have failed to abide by the terms of the relevant contract, including by: (1) disavowing Dr. Toutov's twenty percent equity ownership interest in the entities; and (2) failing to pay Dr. Toutov any profits or distributions.

96.    Dr. Toutov was harmed by each entity's conduct in an amount according to proof.

97.    Each entity's breach was a substantial factor in causing Dr. Toutov harm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

1. For damages in a sum to be determined according to proof, but in no event

17

less than the jurisdictional minimum of this Court;

2. For injunctive relief;

3. That all property, assets, gains, profits, and advantages derived by Defendants from their wrongful acts and other violations of law be deemed to be held in constructive trust for the benefit of Plaintiff;

4. For an award of exemplary and punitive damages;

5. For interest to the extent permitted by law;

6. For costs of suit; and

7. For such other and further relief as this Court deems just and proper.

Dated: December 15, 2020                    **LTL ATTORNEYS LLP**

/s/ Prashanth Chennakesavan
Caleb H. Liang
Prashanth Chennakesavan
Michael A. Pearlson
*Attorneys for Plaintiff*
*Anton Toutov*

# DEMAND FOR JURY TRIAL

Plaintiff Anton Toutov hereby demands a jury trial on all claims so triable.

Dated: December 15, 2020      **LTL ATTORNEYS LLP**

/s/ Prashanth Chennakesavan
Caleb H. Liang
Prashanth Chennakesavan
Michael A. Pearlson
*Attorneys for Plaintiff*
*Anton Toutov*

# EXHIBIT A



# K-STOCK CERTIFICATE

This Certifies that

*Anton Toutov, PhD*

is the holder of **25 shares**

of the 125 total shares issued by *Kova Labs, Inc.*

September 30, 2016
DATE

JONATHAN MARTIN
BOARD MEMBER

PAUL SCOTT
BOARD MEMBER

21

# EXHIBIT B



**Insured Name:**
**Insurer:**
**Policy No.:**

### CORPORATE OFFICERS/DIRECTORS - WAIVER OF WORKERS' COMPENSATION COVERAGE

Pursuant to California Labor Code section 3352(p), I hereby certify, under penalty of perjury, that I am an officer or director of the above-named insured, which is a quasi-public or private corporation, and that I own at least 15 percent (15%) of the issued and outstanding stock of the above-named insured corporation. As a qualifying officer or director, I elect to be excluded from the corporation's workers' compensation insurance policy with the above-referenced insurer. I understand and agree that this written waiver will be effective upon the date of receipt and acceptance by the corporation's insurer and it shall remain in effect until I provide the insurer with a written withdrawal of this waiver. I understand and agree that by signing this waiver, I will not be entitled to coverage under the insured's workers' compensation policy with the above-referenced insurer if an employment-related injury occurs.

| Anton Toutov | Chief Science Officer |
|---|---|
| PRINT OFFICER'S/DIRECTOR'S FULL NAME | TITLE |
|  | 03/29/2017 |
| OFFICER/DIRECTOR SIGNATURE | DATE |

**NOTE TO EMPLOYER: The exclusion will be endorsed to the policy upon our receipt and acceptance of a signed and properly completed form. The person electing exclusion must sign this form. Company representatives may not sign on behalf of the individual. One exclusion per form. Submit additional forms if needed.**

**Submit completed, signed and dated form to:**

Mail:     The Hartford Financial Services Group, Inc.

          California Workers' Compensation Waivers

          3600 Wiseman Blvd.

          San Antonio, TX  78251

Email:   agency.service@thehartford.com

Fax:     888-443-6112

**Form WC 88 04 08**   Printed in U.S.A.

22

# EXHIBIT C

| **State of California** | S |
| --- | --- |

**Secretary of State**

**Statement of Information**
(Domestic Stock and Agricultural Cooperative Corporations)
FEES (Filing and Disclosure): $25.00.
If this is an amendment, see instructions.
IMPORTANT – READ INSTRUCTIONS BEFORE COMPLETING THIS FORM

**FQ84716**

# FILED

In the office of the Secretary of State
of the State of California

**SEP-06 2017**

This Space for Filing Use Only

1. **CORPORATE NAME**

SA LABORATORIES INC.

2. **CALIFORNIA CORPORATE NUMBER**
   C3729328

**No Change Statement** (Not applicable if agent address of record is a P.O. Box address. See instructions.)

3. **If there have been any changes to the information contained in the last Statement of Information filed with the California Secretary of State, or no statement of information has been previously filed, this form must be completed in its entirety.**
   ☐ If there has been no change in any of the information contained in the last Statement of Information filed with the California Secretary of State, check the box and proceed **to Item 17.**

**Complete Addresses for the Following** (Do not abbreviate the name of the city. Items 4 and 5 cannot be P.O. Boxes.)

| | ADDRESS | CITY | STATE | ZIP CODE |
| --- | --- | --- | --- | --- |
| 4. STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE 430 S. CATARACT AVE., SAN DIMAS, CA 91773 | | | | |
| 5. STREET ADDRESS OF PRINCIPAL BUSINESS OFFICE IN CALIFORNIA, IF ANY 430 S. CATARACT AVE., SAN DIMAS, CA 91773 | | | | |
| 6. MAILING ADDRESS OF CORPORATION, IF DIFFERENT THAN ITEM 4 | | | | |

**Names and Complete Addresses of the Following Officers** (The corporation must list these three officers. A comparable title for the specific officer may be added; however, the preprinted titles on this form must not be altered.)

| | ADDRESS | CITY | STATE | ZIP CODE |
| --- | --- | --- | --- | --- |
| 7. CHIEF EXECUTIVE OFFICER/ PAUL ALEXANDER SCOTT 2044 MONTEREY ROAD, SOUTH PASADENA, CA 91030 | | | | |
| 8. SECRETARY ANTON ALEXANDROVICH TOUTOV 385 SOUTH CATALINA AVE., APT. 232, PASADENA, CA 91106 | | | | |
| 9. CHIEF FINANCIAL OFFICER/ JONATHAN MARTIN 205 VIOLET AVE., UNIT A, MONROVIA, CA 91016 | | | | |

**Names and Complete Addresses of All Directors, Including Directors Who are Also Officers** (The corporation must have at least one director. Attach additional pages, if necessary.)

| | ADDRESS | CITY | STATE | ZIP CODE |
| --- | --- | --- | --- | --- |
| 10. NAME PAUL ALEXANDER SCOTT 2044 MONTEREY ROAD, SOUTH PASADENA, CA 91030 | | | | |
| 11. NAME ANTON ALEXANDROVICH TOUTOV 385 SOUTH CATALINA AVE., APT. 232, PASADENA, CA 91106 | | | | |
| 12. NAME JONATHAN MARTIN 205 VIOLET AVE., UNIT A, MONROVIA, CA 91016 | | | | |

13. NUMBER OF VACANCIES ON THE BOARD OF DIRECTORS, IF ANY:

**Agent for Service of Process** If the agent is an individual, the agent must reside in California and Item 15 must be completed with a California street address, a P.O. Box address is not acceptable. If the agent is another corporation, the agent must have on file with the California Secretary of State a certificate pursuant to California Corporations Code section 1505 and Item 15 must be left blank.

14. NAME OF AGENT FOR SERVICE OF PROCESS
JONATHAN MARTIN

| | CITY | STATE | ZIP CODE |
| --- | --- | --- | --- |
| 15. STREET ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, **IF AN INDIVIDUAL** 205 VIOLET AVE., UNIT A, MONROVIA, CA 91016 | | | |

**Type of Business**

16. DESCRIBE THE TYPE OF BUSINESS OF THE CORPORATION
LABORATORY

17. BY SUBMITTING THIS STATEMENT OF INFORMATION TO THE CALIFORNIA SECRETARY OF STATE, THE CORPORATION CERTIFIES THE INFORMATION CONTAINED HEREIN, INCLUDING ANY ATTACHMENTS, IS TRUE AND CORRECT.

| 09/06/2017 | JONATHAN MARTIN | COO | |
| --- | --- | --- | --- |
| DATE | TYPE/PRINT NAME OF PERSON COMPLETING FORM | TITLE | SIGNATURE |

| SI-200 (REV 01/2013) | **Page 1 of 1** | APPROVED BY SECRETARY OF STATE |
| --- | --- | --- |

23

# EXHIBIT D



**CITY OF SAN DIMAS**

245 E. BONITA AVENUE • SAN DIMAS, CA 91773 • (909) 394-6200

**BUSINESS LICENSE CERTIFICATE**

Business/License No. 3940

Type of Business
LABORATORY/TESTING

For Period 10/01/2017 TO 09/30/2018

SA LABORATORIES INC
JONATHON MARTIN, PAUL SCOTT, ANTON TOUTOV
430 S CATARACT AVE
SAN DIMAS, CA 91773

# EXHIBIT E

| **State of California** | S |
|---|---|

## State of California
### Secretary of State

### Statement of Information
(Domestic Stock and Agricultural Cooperative Corporations)
FEES (Filing and Disclosure): $25.00.
If this is an amendment, see instructions.
**IMPORTANT – READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

**G017892**

# FILED

In the office of the Secretary of State
of the State of California

**SEP-04 2018**

1. **CORPORATE NAME**

SA LABORATORIES INC.

2. **CALIFORNIA CORPORATE NUMBER**

C3729328

This Space for Filing Use Only

**No Change Statement**  (Not applicable if agent address of record is a P.O. Box address.  See instructions.)

3. **If there have been any changes to the information contained in the last Statement of Information filed with the California Secretary of State, or no statement of information has been previously filed, this form must be completed in its entirety.**
☐ If there has been no change in any of the information contained in the last Statement of Information filed with the California Secretary of State, check the box and proceed to Item 17.

**Complete Addresses for the Following**  (Do not abbreviate the name of the city.  Items 4 and 5 cannot be P.O. Boxes.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 4.  STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE | 430 S. CATARACT AVE., SAN DIMAS, CA 91773 | | | |
| 5.  STREET ADDRESS OF PRINCIPAL BUSINESS OFFICE IN CALIFORNIA, IF ANY | 430 S. CATARACT AVE., SAN DIMAS, CA 91773 | | | |
| 6.  MAILING ADDRESS OF CORPORATION, IF DIFFERENT THAN ITEM 4 | | CITY | STATE | ZIP CODE |

**Names and Complete Addresses of the Following Officers**  (The corporation must list these three officers.  A comparable title for the specific officer may be added; however, the preprinted titles on this form must not be altered.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 7.  CHIEF EXECUTIVE OFFICER/ | PAUL ALEXANDER SCOTT     2044 MONTEREY RD., SOUTH PASADENA, CA 91030 | | | |
| 8.  SECRETARY | JONATHAN  MARTIN    205 VIOLET AVE., UNIT A, MONROVIA, CA 91016 | | | |
| 9.  CHIEF FINANCIAL OFFICER/ | JONATHAN  MARTIN    205 VIOLET AVE., UNIT A, MONROVIA, CA 91016 | | | |

**Names and Complete Addresses of All Directors, Including Directors Who are Also Officers**  (The corporation must have at least one director.  Attach additional pages, if necessary.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 10.  NAME | PAUL ALEXANDER SCOTT    2044 MONTEREY RD., SOUTH PASADENA, CA 91030 | | | |
| 11.  NAME | JONATHAN  MARTIN    205 VIOLET AVE., UNIT A, MONROVIA, CA 91016 | | | |
| 12.  NAME | ANTON ALEXANDROVICH TOUTOV    3330 EAST FOOTHILL BLVD., #435, PASADENA, CA 91107 | | | |

13.  NUMBER OF VACANCIES ON THE BOARD OF DIRECTORS, IF ANY:

**Agent for Service of Process**  If the agent is an individual, the agent must reside in California and Item 15 must be completed with a California street address, a P.O. Box address is not acceptable.  If the agent is another corporation, the agent must have on file with the California Secretary of State a certificate pursuant to California Corporations Code section 1505 and Item 15 must be left blank.

14.  NAME OF AGENT FOR SERVICE OF PROCESS
JONATHAN  MARTIN

| 15.  STREET ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, IF AN INDIVIDUAL | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 205 VIOLET AVE., UNIT A, MONROVIA, CA 91016 | | | |

**Type of Business**

16.  DESCRIBE THE TYPE OF BUSINESS OF THE CORPORATION
LABORATORY

17.  BY SUBMITTING THIS STATEMENT OF INFORMATION TO THE CALIFORNIA SECRETARY OF STATE, THE CORPORATION CERTIFIES THE INFORMATION CONTAINED HEREIN, INCLUDING ANY ATTACHMENTS, IS TRUE AND CORRECT.

| 09/04/2018 | JONATHAN  MARTIN | COO | |
|---|---|---|---|
| DATE | TYPE/PRINT NAME OF PERSON COMPLETING FORM | TITLE | SIGNATURE |

| SI-200 (REV 01/2013) | **Page 1 of 1** | APPROVED BY SECRETARY OF STATE |
|---|---|---|

# EXHIBIT F

## DISCLOSURE OF OWNERSHIP AND CONTROL INTEREST STATEMENT

### I. Identifying Information

| Name of entity | D/B/A | | | |
|---|---|---|---|---|
| SA Laboratories, Inc. | KorvaLabs, Inc. | | | |

| Address (number, street) | | City | State | ZIP code |
|---|---|---|---|---|
| 430 S. Cataract Ave. | | San Dimas | CA | 91773 |

| CLIA number | Taxpayer ID number (EIN) | Telephone number |
|---|---|---|
| 05D2141174 | 472462178 | ( 424 ) 645-7575 |

II. Answer the following questions by checking "Yes" or "No." If any of the questions are answered "Yes," list names and addresses of individuals or corporations under "Remarks" on page 2. Identify each item number to be continued.

|  | YES | NO |
|---|---|---|
| A. Are there any individuals or organizations having a direct or indirect ownership or control interest of five percent or more in the institution, organizations, or agency that have been convicted of a criminal offense related to the involvement of such persons or organizations in any of the programs established by Titles XVIII, XIX, or XX? | ☐ | ☑ |
| B. Are there any directors, officers, agents, or managing employees of the institution, agency, or organization who have ever been convicted of a criminal offense related to their involvement in such programs established by Titles XVIII, XIX, or XX? | ☐ | ☑ |
| C. Are there any individuals currently employed by the institution, agency, or organization in a managerial, accounting, auditing, or similar capacity who were employed by the institution's, organization's, or agency's fiscal intermediary or carrier within the previous 12 months? (Title XVIII providers only) | ☐ | ☑ |

III. A. List names, addresses for individuals, or the EIN for organizations having direct or indirect ownership or a controlling interest in the entity. (See instructions for definition of ownership and controlling interest.) List any additional names and addresses under "Remarks" on page 2. If more than one individual is reported and any of these persons are related to each other, this must be reported under "Remarks."

| NAME | ADDRESS | EIN |
|---|---|---|
| Jonathan Martin | 205 Violet Ave. Unit A, Monrovia, CA 91016 | |
| Paul Scott | 2044 Monterey Rd., South Pasadena, CA 91030 | |
| Anton Toutov | 3330 East Foothill Blvd. #435, Pasadena CA 91107 | |

B. Type of entity:  ☐ Sole proprietorship     ☐ Partnership     ☒ Corporation
                    ☐ Unincorporated Associations     ☐ Other (specify) _____

C. If the disclosing entity is a corporation, list names, addresses of the directors, and EINs for corporations under "Remarks."

D. Are any owners of the disclosing entity also owners of other Medicare/Medicaid facilities? (Example: sole proprietor, partnership, or members of Board of Directors) If yes, list names, addresses of individuals, and provider numbers. ........................................................................................  ☐   ☒

| NAME | ADDRESS | PROVIDER NUMBER |
|---|---|---|
| | | |
| | | |
| | | |

LAB 1513 (7/07)

26

|  |  | YES | NO |
|---|---|---|---|
| IV. | A. Has there been a change in ownership or control within the last year? | ☒ | ☐ |
|  | If yes, give date. _01/01/2018_ |  |  |
|  | B. Do you anticipate any change of ownership or control within the year? | ☐ | ☒ |
|  | If yes, when? |  |  |
|  | C. Do you anticipate filing for bankruptcy within the year? | ☐ | ☒ |
|  | If yes, when? |  |  |
| V. | Is the facility operated by a management company or leased in whole or part by another organization? | ☐ | ☒ |
|  | If yes, give date of change in operations. |  |  |
| VI. | Has there been a change in Administrator, Director of Nursing, or Medical Director within the last year? | ☐ | ☒ |
| VII. | A. Is this facility chain affiliated? | ☐ | ☒ |
|  | (If yes, list name, address of corporation, and EIN.) |  |  |

| Name | | EIN | |
|---|---|---|---|
| Address (number, name) | City | State | ZIP code |

B. If the answer to question VII.A. is NO, was the facility ever affiliated with a chain?
   (If yes, list name, address of corporation, and EIN.)

| Name | | EIN | |
|---|---|---|---|
| Address (number, name) | City | State | ZIP code |

*Whoever knowingly and willfully makes or causes to be made a false statement or representation of this statement, may be prosecuted under applicable federal or state laws. In addition, knowingly and willfully failing to fully and accurately disclose the information requested may result in denial of a request to participate or where the entity already participates, a termination of its agreement or contract with the state agency or the secretary, as appropriate.*

| Name of authorized representative (typed) | Title |
|---|---|
| Jonathan Martin | Chief Operating Officer |

| Signature | Date |
|---|---|
|  | 09/06/2018 |

Remarks

LAB 1513 (7/07)

27

# EXHIBIT G

Curative SARS-Cov-2 Assay

## ACCELERATED EMERGENCY USE AUTHORIZATION (EUA) SUMMARY
## CURATIVE SARS-COV-2 ASSAY
## (KorvaLabs Inc. Clinical Laboratory)

*For in vitro* diagnostic use
Rx only
For use under Emergency Use Authorization (EUA) Only

**(The Curative SARS-Cov-2 Assay will be performed in the KorvaLabs Inc. Clinical Laboratory, a Clinical Laboratory Improvement Amendments of 1988 (CLIA), 42 U.S.C. §263a certified high-complexity laboratory, per the Instructions for Use that were reviewed by the FDA under this EUA).**

**INTENDED USE**

The Curative SARS-Cov-2 Assay is a real-time RT-PCR test intended for the qualitative detection of nucleic acid from the SARS-CoV-2 in oropharyngeal (throat) swab, nasopharyngeal swab, nasal swab, and oral fluid specimens from individuals suspected of COVID-19 by their healthcare provider. Testing is limited to the single site of KorvaLabs, Inc. San Dimas, CA, that is a Clinical Laboratory Improvement Amendments of 1988 (CLIA), 42 U.S.C. §263a certified high-complexity laboratory.

Collection of nasal swabs and oral fluid specimens is limited to symptomatic individuals within 14 days of COVID-19 symptom onset. Specimen collection must be directly observed and directed during the sample collection process by a trained healthcare worker at the specimen collection site. Negative results for SARS-CoV-2 RNA from oral fluid specimens should be confirmed by testing of another specimen type authorized for use with this test if clinically indicated.

Results are for the detection of SARS-CoV-2 RNA. The SARS-CoV-2 RNA is generally detectable in respiratory specimens during the acute phase of infection. Positive results are indicative of the presence of SARS-CoV-2 RNA; clinical correlation with patient history and other diagnostic information is necessary to determine patient infection status. Positive results do not rule out bacterial infection or co-infection with other viruses. The agent detected may not be the definite cause of disease. Laboratories within the United States and its territories are required to report all positive results to the appropriate public health authorities.

Negative results do not preclude SARS-CoV-2 infection and should not be used as the sole basis for patient management decisions. Negative results must be combined with clinical observations, patient history, and epidemiological information.

The assay is intended for use under the Food and Drug Administration's Emergency Use Authorization.

Curative SARS-Cov-2 Assay

**DEVICE DESCRIPTION AND TEST PRINCIPLE**

The Curative SARS-CoV-2 Assay is a real-time reverse transcription polymerase chain reaction (rRT-PCR) test. The assay uses primers and probes that were developed and validated under the Emergency Use Authorization (EUA) for the CDC 2019-Novel Coronavirus (2019-nCoV) Real-Time RT-PCR Diagnostic Panel and are designed to detect RNA from SARS-CoV-2 in respiratory specimens from patients as recommended for testing by public health authority guidelines. The purpose of this EUA request is to enable testing of additional specimen types, including oral fluid specimens and use of alternative nucleic acid extraction and amplification systems available in KorvaLabs, Inc.

Oropharyngeal (throat) swab, nasopharyngeal swab, and nasal swabs should be collected, transported and stored according to standard procedures. Nasal swabs and oral fluid specimens must be collected using a swab (Curative Inc., #K00023) into the sample collection tube (Curative Inc., #K00016) containing DNA/RNA Shield (Zymo Research, #R1100). Nasal swabs and oral fluid specimens must be transported and stored at ambient temperature and tested within 4 days of collection.

RNA Extraction for all specimen types is performed using Total RNA Purification 96-Well Kit (Norgen Biotek Corporation) manually or using Tecan Resolvex A200. The input sample volume is 300μl, the elution volume is 60μl.

Reverse transcriptase-PCR (RT-PCR) is performed using Applied Biosystems TaqPath™ 1-Step Multiplex Master Mix with 5μl of the extracted sample.

**INSTRUMENTS USED WITH THE TEST**

The Curative SARS-CoV-2 Assay is for use with the BioRad CFX 96 Touch, BioRad CFX Connect Real-Time PCR systems and Roche LightCycler 480 II Real-Time PCR systems. RT-PCR processing and data analysis is being performed by BioRad CFX Maestro V1.1 and Roche LightCycler Software V1.5.

**REAGENTS AND MATERIALS**

**Table 1. Reagents and materials required for use with Curative SARS-CoV-2 Assay**

| Material ID | Vendor | Catalog # |
|---|---|---|
| Ultrapure water | RX Bioscience | P01-UPW01-500 |
| N1 Primers/Probes | IDT Biosearch Technologies | 10006606 KIT-NCOV-PP1-1000 |
| N2 Primers/Probes | IDT Biosearch Technologies | 10006606 KIT-NCOV-PP1-1000 |
| RP Primers/Probes | IDT Biosearch Technologies | 10006606 KIT-NCOV-PP1-1000 |
| TaqPath™ 1-Step Multiplex Master Mix | Applied Biosystems™ | A28527 |

Curative SARS-Cov-2 Assay

**LIMITATIONS**
The performance of the Curative SARS-CoV-2 Assay was established using oral fluid specimen. Nasopharyngeal swabs, oropharyngeal swabs and nasal swabs are considered acceptable specimen types for use with the Curative SARS-CoV-2 Test but performance has not been established.

Testing of nasal swabs and oral fluid specimens (self-collected while directly observed and directed by a trained healthcare worker at the site of sample collection or collected by a trained healthcare worker) is limited to symptomatic individuals within 14-days of COVID-19 symptom onset.

**CONTROLS**
<u>Negative Process Control:</u> The negative process control consists of uninfected collection media, and two replicates are processed with every extraction batch run.
<u>SARS-CoV-2 and RP Positive Process Control</u>: This control monitors the success of the RNA extraction and confirms the performance of the RT-PCR master mix. The positive process control consists of uninfected collection media spiked with quantified nCoV plasmid and Hs_RPP30 gene.
<u>RP Positive Extraction Control</u>: Detection of RNase P RNA in extracted nucleic acid serves as a positive extraction control for each sample. It also confirms the absence of PCR inhibitors in each eluted RNA sample.

**Table 2. Controls performed with Curative SARS-CoV-2 Assay**

| Control Type | Used to Monitor | Frequency of Testing | |
|---|---|---|---|
| | | **SARS-CoV-2 N** | **RP** |
| Negative extraction control | Cross-contamination during extraction | Once per run of RT-PCR | Once per run of RT-PCR |
| SARS-CoV-2/ RP Positive Process control | Inefficient lysis of specimen, poor specimen collection, improper assay setup, extraction failure, PCR inhibition, reagent failure including primer and probe degradation | Once per run of RT-PCR | Once per run of RT-PCR |
| RP Positive extraction control | Inefficient lysis of specimen, poor specimen collection, improper assay setup, extraction failure, PCR inhibition, reagent failure including primer and probe degradation | Once per run of RT-PCR | Once per run of RT-PCR |

If the SARS-CoV-2 N assay is positive with a negative RP result, consider the sample valid and proceed with the next steps.
If the SARS-CoV-2 N assay is negative in conjunction with a negative RP, the specimen results are considered invalid and should be repeated. If the residual specimen is available, re-extract the specimen and perform testing again. If results remain invalid, a new specimen should be collected.

**Curative SARS-Cov-2 Assay**

**Table 3. Ct values of controls for validation of results**

| Control Type | Used to Monitor | Expected results and Ct Values | |
|---|---|---|---|
| | | SARS-CoV-2 N | RP |
| Negative extraction control | Cross-contamination during extraction | Negative Ct not detected or Ct>40 | Negative Ct not detected or Ct >35 |
| SARS-CoV-2/ RP Positive Process control | Inefficient lysis of specimen, poor specimen collection, improper assay setup, extraction failure, PCR inhibition, reagent failure including primer and probe degradation | Positive $0 < Ct \leq 40$ | Positive $0 < Ct \leq 35$ |
| RP Positive extraction control | Inefficient lysis of specimen, poor specimen collection, improper assay setup, extraction failure, PCR inhibition, reagent failure including primer and probe degradation | Negative Ct not detected | Positive $0 < Ct \leq 35$ |

**INTERPRETATION OF RESULTS**

The results from testing of patient samples are interpreted according to the criteria described in **Table 4.**

**Table 4.  Interpretation of Patient Samples**

| SARS-CoV-2 N | RP | Result Interpretation | Report | Action |
|---|---|---|---|---|
| Ct detected in the range $0 < Ct \leq 35$ | ± | SARS-CoV-2 detected | Presumptive Positive SARS-CoV-2 | Report result to sender and local or state department of health. |
| No Ct or Ct>40 | $0 < Ct \leq 35$ | SARS-CoV-2 not detected | Negative SARS-CoV-2 | Report results to submitter. |
| Ct detected in the range $35 < Ct \leq 40$ | ± | Mandatory repeat | Hold reporting till confirmatory testing | Repeat extraction from the sample |
| No Ct or Ct>40 | No Ct or Ct>35 | Invalid Result | Invalid | Repeat extraction from the sample. If the repeated result remains invalid, report the result to the sender and local or state department of health, and recommend the collection of a new |

Curative SARS-Cov-2 Assay

| | | | | specimen from the patient. |
|---|---|---|---|---|

## PERFORMANCE EVALUATION

### I.    Analytical Sensitivity

The LoD was determined using viral genomic RNA (BEI Resources Catalog No. NR-52285 (Lot # 70333700) that were diluted in SARS-CoV-2 negative oral fluid specimens from volunteer donors into DNA/RNA Shield solution (Zymo Research, #R1100). An initial estimate of the LoD with both the Bio-Rad CFX and Roche LightCycler 480 II was obtained by testing four replicates at each of four different target levels: 1600, 800, 400 and 200 copies/mL. At all analyte levels, four out of four replicates passed. Based on these results, two analyte concentration ranges (200 copies/mL and 100 copies/mL) were selected for confirmation with 20 replicates each. For both automated and manual extraction methods and both PCR systems, all 20 replicates at 200 copies/mL produced the expected results for the SARS-CoV-2 target, and the LoD was therefore confirmed to be 200 copies/mL.

**Table 5: Summary of Analytical Sensitivity Results for Curative SARS-CoV-2 Assay**

| | Manual Extraction | | Automated Extraction | |
|---|---|---|---|---|
| **Concentration of Viral RNA** | BioRad CFX | Roche LightCycler 480 | BioRad CFX | Roche LightCycler 480 |
| **200 copies/mL** | 20/20 | 20/20 | 20/20 | 20/20 |
| **100 copies/mL** | 15/20 | 20/20 | 19/20 | 17/20 |

### II.    Analytical specificity

*Inclusivity*

The Curative SARS-CoV-2 Assay comprises only primers and probes designed by CDC from the CDC 2019-Novel Coronavirus (2019-nCoV) Real-Time RT-PCR Diagnostic Panel without any changes. Inclusivity of the CDC Diagnostic panel has been previously established.

*Cross-reactivity*

The Curative SARS-CoV-2 Assay comprises only primers and probes designed by CDC from the CDC 2019-Novel Coronavirus (2019-nCoV) Real-Time RT-PCR Diagnostic Panel without any changes. Cross-reactivity of the CDC Diagnostic panel has been previously established.

### III.    Clinical evaluation

A clinical study was performed to evaluate the use of oral fluid specimens as a specimen type for detection of SARS-CoV-2 in patients who are suspected of COVID-19. People

**Curative SARS-Cov-2 Assay**

who were previously tested at a drive through location in Los Angeles where testing was performed by Curative Inc. were contacted for their willingness to participate in this study.

Tables 7-10 summarize performance of the Curative SARS-CoV-2 test for self-collected oral fluid swabs, non-healthcare worker (HCW) observed or directed and put into Zymo DNA/RNA Shield RNA preservative compared to clinician collected nasopharyngeal swab put into Zymo DNA/RNA Shield RNA preservative:

| Table 7:  All Individuals (Symptomatic and Asymptomatic) | | Clinician Collected Nasopharyngeal Swab (in RNA preservative) | | |
|---|---|---|---|---|
| | | Positive | Negative | Total |
| **Self-Collected Oral Fluid Swab (Non-HCW observed/directed) in RNA preservative** | **Positive** | 15 | 4 | 19 |
| | **Negative** | 8 | 17 | 25 |
| | **Total** | 23 | 21 | 44 |
| **Positive Agreement** | | 65.2% (95% CI 44.9-81.2%) | | |
| **Negative Agreement** | | 81.0% (95% CI 60.0-92.3%) | | |

*1 oral fluid swab sample was QNS (quantity not sufficient) and was excluded from analysis

When the test is limited to individuals symptomatic at the time of collection, within 21 days of symptom onset, but not observed and directed by HCW during collection, the test performance is as follows:

| Table 8:  Symptomatic at time of collection | | Clinician Collected Nasopharyngeal Swab (in RNA preservative) | | |
|---|---|---|---|---|
| | | Positive | Negative | Total |
| **Self-Collected Oral Fluid Swab (Non-HCW observed/directed) in RNA preservative** | **Positive** | 15 | 1 | 16 |
| | **Negative** | 5 | 3 | 8 |
| | **Total** | 20 | 4 | 24 |
| **Positive Agreement** | | 75.0% (95% CI 53.1-88.8%) | | |
| **Negative Agreement** | | 75.0 % (95% CI 30.1-95.5%) | | |

When the test is limited to individuals symptomatic at time of collection and less than 14 days since symptom onset, but not observed and directed by HCW during collection, the test performance is as follows:

**Curative SARS-Cov-2 Assay**

| Table 9:  Symptomatic at time of collection, >14 days since symptom onset | | Clinician Collected Nasopharyngeal Swab (in RNA preservative) | | |
|---|---|---|---|---|
| | | Positive | Negative | Total |
| **Self-Collected Oral Fluid Swab (Non-HCW observed/directed) in RNA preservative** | **Positive** | 4 | 1 | 5 |
| | **Negative** | 3 | 0 | 3 |
| | **Total** | 7 | 1 | 8 |
| **Positive Agreement** | | 57.1 % (95% CI 25.0-84.2%) | | |
| **Negative Agreement** | | 0/1 | | |

When testing is limited to asymptomatic individuals at time of collection, but not observed and directed by HCW during collection, the test performance is as follows:

| Table 10:  Asymptomatic at time of collection | | Clinician Collected Nasopharyngeal Swab (in RNA preservative) | | |
|---|---|---|---|---|
| | | Positive | Negative | Total |
| **Self-Collected Oral Fluid Swab (Non-HCW observed/directed) in RNA preservative** | **Positive** | 0 | 3 | 3 |
| | **Negative** | 3 | 14 | 17 |
| | **Total** | 3 | 17 | 20 |
| **Positive Agreement** | | 0/3 | | |
| **Negative Agreement** | | 82.4 % (95% CI 59.0-93.8%) | | |

*1 oral fluid swab sample was QNS (quantity not sufficient) and was excluded from analysis

In the table above, all three false negatives were from individuals tested as asymptomatic at time of collection, but previously symptomatic, within 17 days of symptom onset (7, 14, and 17 days).

The data above does not support use of the Curative SARS-CoV-2, for any individuals for self-collected oral fluid samples when not directly observed and directed by a trained healthcare worker during collection and at the site of collection. A modification to the original clinical study acceptance criteria was made. Subjects more than 14 days from symptom onset at time of collection, and subjects who were no longer symptomatic, were excluded from the final clinical study. A total of 52 subjects were enrolled. Upon obtaining consent, a clinician drove to the subjects' home with a testing kit, the written research study information form, and the sample collection materials. Testing kits included components for collecting 4 different sample types and all samples were collected into DNA/RNA Shield (Zymo Research).

Subjects were instructed to complete self-collection of the oral fluid specimen and nasal specimen while observed and directed by the study clinician and package the sample into the collection bag. Then the clinician collected a nasopharyngeal sample from the subject. All three specimens were collected in the same visit within a 30-minute window.

There was 100% positive and negative agreement between the results obtained from testing of clinician observed and directed, self-collected oral fluid swabs put into Zymo

34

**Curative SARS-Cov-2 Assay**

DNA/RNA Shield and those obtained from clinician collected nasopharyngeal swabs put into Zymo DNA/RNA Shield. There was 97% positive agreement and 100% negative agreement between the results obtained from testing of clinician observed and directed, self-collected nasal swabs put into Zymo DNA/RNA Shield and those obtained from clinician collected nasopharyngeal swabs put into Zymo DNA/RNA Shield. A summary of the results of the study is presented in **Table 11**.

**Table 11**. **Summary of qualitative results obtained from parallel testing of nasopharyngeal swabs, nasal swabs and oral fluid specimens.**

| | | Nasopharyngeal Swab (In RNA Preservative) | | |
|---|---|---|---|---|
| | | Positive | Negative | Total |
| **Oral Fluid Swab (observed and directed) in RNA preservative** | **Positive** | 34 | 0 | 34 |
| | **Negative** | 0 | 18 | 18 |
| | **Total** | 34 | 18 | 52 |
| **Positive Agreement** | | 100 % (34/34) | | |
| **Negative Agreement** | | 100 % (18/18) | | |

| | | Nasopharyngeal Swab (In RNA Preservative) | | |
|---|---|---|---|---|
| | | Positive | Negative | Total |
| **Nasal Swab (observed and directed) in RNA preservative** | **Positive** | 32* | 0 | 32 |
| | **Negative** | 1 | 18 | 19 |
| | **Total** | 33 | 18 | 51* |
| **Positive Agreement** | | 97.0 % (32/33) | | |
| **Negative Agreement** | | 100 % (18/18) | | |

*one nasal swab sample was QNS (quantity not sufficient) and is excluded

A modified second study was performed to evaluate the use of oral fluid specimens as a specimen type for detection of SARS-CoV-2 in patients who are suspected of COVID-19. The study was modified to collect the nasopharyngeal swabs into Viral Transport Media which was sent to another laboratory (CMB Laboratories, Cypress, CA) and run on the CDC 2019-nCoV Real-Time RT-PCR Diagnostic Panel which has been authorized by the FDA under an Emergency Use Authorization and validated by CMB Laboratories. Oral fluid swab and nasal swab samples were collected as before and processed at Curative Inc. CDC Sample Handling Guidelines were followed for collection, transport and processing of nasopharyngeal swabs samples in viral transport media. A further 28 participants were enrolled in this modified study.

There was 100% positive and negative agreement between the results obtained from testing of oral fluid specimens or nasal swabs and those obtained from nasopharyngeal swabs. A summary of the results of the study is presented in **Table 12**.

**Table 12**. **Summary of qualitative results obtained from parallel testing of clinician collected nasopharyngeal swabs (following CDC 2019-nCoV Real-Time RT-PCR Diagnostic Panel) compared to nasal swabs and oral fluid specimens self-collected while observed and directed by a clinician.**

**Curative SARS-Cov-2 Assay**

| | | Nasopharyngeal Swab (In VTM) | | |
|---|---|---|---|---|
| | | Positive | Negative | Total |
| Oral Fluid Swab (observed and directed) in RNA preservative | Positive | 16 | 0 | 16 |
| | Negative | 0 | 12 | 12 |
| | Total | 16 | 12 | 28 |
| Positive Agreement | | 100 % (16/16) | | |
| Negative Agreement | | 100 % (12/12) | | |

| | | Nasopharyngeal Swab (In VTM) | | |
|---|---|---|---|---|
| | | Positive | Negative | Total |
| Nasal Swab (observed and directed) in RNA preservative | Positive | 16 | 0 | 16 |
| | Negative | 0 | 12 | 12 |
| | Total | 16 | 12 | 28 |
| Positive Agreement | | 100 % (16/16) | | |
| Negative Agreement | | 100 % (12/12) | | |

*Clinical Confirmation*

The first 5 positive and the first 5 negative oral fluid specimens as determined by the Curative SARS-CoV-2 Assay were sent to the UCLA Clinical Microbiology Laboratory and processed using the Thermo Fisher Scientific, Inc. TaqPath COVID-19 Combo Kit. There was 100% (5/5) positive and 100% (5/5) negative agreement for the specimens tested. The results are acceptable and support use of the Curative SARS-CoV-2 Assay for testing clinical specimens only according to the intended use, limitations, and only with the reagents, instruments, and processes described herein

WARNINGS:

- This test has not been FDA cleared or approved;

- This test has been authorized by FDA under an EUA for use by the authorized laboratory;

- This test has been authorized only for the detection of nucleic acid from SARSCoV-2, not for any other viruses or pathogens; and

- This test is only authorized for the duration of the declaration that circumstances exist justifying the authorization of emergency use of in vitro diagnostic tests for detection and/or diagnosis of COVID-19 under Section 564(b)(1) of the Act, 21 U.S.C. § 360bbb-3(b)(1), unless the authorization is terminated or revoked sooner.